Good morning, your honors. My name is Michael J. Tremann. I represent Mr. Carr. There are two other co-defendants in the case. We have divided up the time. I will take five minutes and ask to reserve a minute. And the other two counsel will equally divide the remaining time. This whole issue I wish to address the court about this morning is the impact of the lean decision on the sentence imposed on Mr. Carr. The government basically raises two arguments in opposition to our contention that the case should be remanded for resentencing. Basically, their two arguments come down to one argument, which is that it doesn't matter. They argue that it doesn't matter factually, and they argue that it doesn't matter because the district court judge said that he would impose the same sentence if there were no mandatory minimums applicable to the case. The factual issues we submit, they are incorrect. They are incorrect for two reasons. One is because the standard is not what any of the cases that they rely on assert. The standard is whether or not the government could have proven beyond a reasonable doubt that it was reasonably foreseeable to Mr. Carr that a weapon was going to be discharged during the escape portion of the bank robbery. I thought that the weapon issue did go to the jury. The only thing that didn't was the discharge, right? Well, the possession did go to the jury. Use. Use. But the discharge did not. Right. Okay. And so the issue is whether or not. That's a narrower issue in a way because it means that they would have, you have to assume that he knew that a gun was going to be used. And the question was, knowing that, could he have foreseen that it would have been discharged? Yes, Your Honor. Okay. He found that Franklin couldn't have foreseen this. The district court judge did in connection with the Rule 29 motion. Well, both firearms charges, right? Well, the enhancement under 211-3 and also the 924. Yes. Right. So that's really the question I have. I don't want to get you off track if you want to talk about a lien, but it seems to me that it's sort of a domino effect. And I don't see any evidence in the record that's different in terms of, you know, advanced planning. And the judge was very clear in saying, I think, that he didn't think there was reason to think that the use of the weapon was foreseeable as to Franklin. So why would it be as to Carr? What was different? I think there may be a couple of things that are different. One of them is where the different people are because. But that involves a finding of fact because the witness testimony was different about who was the FedEx guy and who was the second robber. Well, yes, the witness's testimony was slightly contradictory about that. But the only credible evidence about what Mr. Carr did is that he was the FedEx. And that has to be the case because of the fact that he also picked up the enhancement for moving the woman in connection with the doorway that we all sleep with. So there's no doubt. Well, the jury didn't make that finding, but that was right. No, the jury did make that finding. But it is a problem, which, and I think maybe this is what Judge Christian is alluding to, that, in fact, the jury made the same findings as to all three of the defendants. The judge then differentiated them by granting Rule 29 motions with regard to the aspiratation and the drug usage as to some of them. Carr, he didn't grant any of the Rule 29 motions. So the judge was of the view, but I don't know how he got to that view without making a finding, that it was Carr who was the FedEx person. But the jury didn't find that. Right? Well, it's my view that that's the only credible position you can take in the evidence for two reasons. One is because that is the only evidence. Well, wait a minute. What about Fields? Fields had them reversed. Fields had Mr. Carr as the FedEx driver. He got out of her car, went to the door. That's what she said, but the tellers had it reversed, counsel. Right? Well, the teller at the door did not have it reversed. The only person that had it reversed was the security guard, who thought differently. But in terms of the tellers and in terms of Ms. Fields, there was no issue about whether or not Mr. Carr was the FedEx driver. He had the box. He was at the door. He's the one who was involved in the tussle that took place at the door. And the reason that matters for your current argument is because the FedEx driver didn't shoot a gun, as far as we know. Well, he didn't have a gun. There was absolutely no evidence, either that you could infer or that was direct. Do we know who shot the guns in the car? Well, the answer is you do not know specifically, but you know who had at least one of the guns, both in the car and subsequently. Right. Who was the other robber? The third person we don't know about. Well, the third person had the gun. According to Ms. Fields, he was the first time she ever saw a gun. So there's only a 50 percent chance that Carr was the other guy shooting out of the car. Well, there were at least three or maybe four in the car, but let's say three. She said three. And she said two of the three were shooting, and one of them was the third guy, the unidentified person. No, she said two people were shooting. She never said who any of the three were who were shooting. That's what I just said, counsel. I'm sorry, Your Honor. But she said the third person was one of them. So that leaves only a 50 percent chance that your client was one of the other two. She didn't even say that the third person was one of them, Your Honor, to be fair. She said she didn't know. Well, I think I have it in the record, but go on. I don't want to take up your time. So as a practical matter, there are three people in the car, according to Ms. Fields. There are two who shoot. But the question for Carr's purposes is whether either Carr was the person who shot or he was foreseeable because he was with other people who he knew had guns. And we know he knew that because he was, when he was in the credit union, the other guy was pointing guns at people. And that's the first time in the series of events that Mr. Carr could have known that there were guns that were present in the middle of the robbery inside the bank, assuming, and I'll give Your Honor the assumption, that he saw the fact that one of the other robbers had a gun. Nobody in the car, when Mr. Carr was in the automobile, nobody had a weapon that was exposed, according to Ms. Fields. But that's why I started with the premise that there was a jury, but the fact that there was a jury finding that the use of guns was foreseeable. So that's kind of off the table. And the only thing that's on the table is whether he somehow would have foreseen that they were going to be used but not foreseen that they were going to be discharged. And that seems like an extremely difficult assumption from this set of facts. I mean, people will use guns in bank robberies in order to shoot them if there's a problem. And, in fact, there was a problem and they did shoot them. And the point is Mr. Carr was entitled under the U.S. Supreme Court decision, which the facts are almost identical to what Your Honor has just outlined, to have a jury make that determination beyond a reasonable doubt. And my point is that there were facts that you could argue, such as when it was that it first became apparent that there were any guns in the robbery, that he didn't know about it until he was in the middle of the robbery, and then knowing about it in the middle of the robbery, his only choices were what? Leave the bank, get in the car, and leave. But wouldn't that undermine the jury verdict as to the use of guns? No, because he saw the gun in the robbery. He saw the gun in the bank. He saw it being possessed. Did he appeal this issue? I'm sorry, Your Honor? The issue you're articulating now is the issue that's bothered me from the beginning. But did he appeal that issue? He appealed it in the sense that he filed a notice of appeal, both appealing the conviction and sentence. So in that sense, yes, he appealed it since it was an available issue to raise since the case had not been fully briefed and had not been resolved. So we filed a motion with this Court for leaves to file that issue as part of the supplemental brief, and that motion was granted. So you think I need to look at your supplemental brief and I will see this argument? Oh, about the factual question? Yes. Oh, I'm sorry. I misunderstood the Court. That was not specifically addressed in the supplemental brief. There was no reply brief filed. We were granted leaves to file a supplemental brief. The factual issue was not raised until the subsequent brief filed by the government, which is why I'm addressing it now, is that there were facts in the record from which you could have filed a motion to file a reply brief. You know you could have. And, yes, Your Honor, I could have. I'm not going to argue that I couldn't have made that motion. But the issue was whether or not we were entitled to have a jury determination on that question. And I think the government concedes, other than saying it doesn't matter, that we were entitled to have that decision made. Yes, you were. Clearly you were. But the question is, there is this whole realm of, I find very confusing and disturbing, harmless error law dealing with a prentee, which I'm assuming applies from a whole hog to a lane, and which does allow some of this after-the-fact determinations as to what a jury would have found beyond a reasonable doubt had it been allowed to do anything. And the question is, why isn't this one of those? And at least here we do have a record. And there was a jury. So it's not, in some instances you're bringing in facts after the fact. But nobody's trying to do that here. We're just looking at an existing record. And you have to try to explain to me on what, how it would be, you tried, but it didn't seem to work to me, that he could have foreseen the use but not foreseen the discharge. I don't accept the premise, and I don't believe there are any cases that accept the premise and establish the premise that the fact of the presence of a gun, and subsequently that there's a discharge, that that discharge isn't an additional element that needs to be proven to a jury beyond a reasonable doubt. Now, under the question Your Honor asked, that second wouldn't be necessary. If there was a gun and if it was discharged, then, and the defendant is not the person doing the discharge. It should be a directed verdict against the defendant under that approach. But it's not a directed verdict because the question is whether or not a jury would take that step and find that it was reasonably foreseeable beyond a reasonable doubt. You're way, way over your time. So do you want to briefly address the other contention, i.e., that the district judge said he would have given the same sentence anyway? And that we did address in the supplemental brief extensively. So I can submit it on that brief. All right. Thank you. Good morning, Your Honors. Rebecca Jones on behalf of Appellant and Cross Appellee Mark Franklin. I was going to briefly address the sentencing issue, the eyewitness ID issue, and only touch upon the Rule 29 motion and save most of the rest of my time to respond to the government since we're appellee on the Rule 29 issue, if that's okay with the court. In regard to sentencing, the first point I just wanted to make is obviously, which unfortunately I realized kind of late, but if this court decides to grant a lane relief to Carr and Anderson, even though Mr. Franklin doesn't have an lane claim, it puts him in a different light also, right? Because then he'll end up he potentially ends up with the longest sentence because the judge sentenced him believing that he was imposing these ten minutes. He's not briefed, right? Pardon? Not an argument that's been briefed. No, no. That hasn't been briefed because Mr. Lane or Mr. Lane. Mr. Franklin doesn't have an lane claim. He did raise sentencing claims. The on the. They're all on the same page in terms of what the district court did. That is that. He did not. In fact, he in fact granted the rule 29 on with regard to Mr. Franklin on both the gun and the exportation. Yeah, that's it's tough, isn't it? I mean, it's so we have a written order from April 27th, 2011, where he explicitly grants the rule 29 as to the gun use allegation and explicitly denies it as to the forcible accompaniment allegation. But then he goes through this kind of rambling conversation at the sentencing hearing and sort of implicitly acquits Anderson and Franklin of the forcible movement allegation by saying he's not going to sentence on that. But it's a problem. I mean, I don't, you know. It's a problem because his words don't match the judgment, right? Right. Right. But isn't there a clear law that says that when that's true, the oral pronouncement of that governs? Correct. Correct. And I did. So what relief are you seeking? Well, first of all, as regards to the Rule 29 issues, I want, obviously, I want this Court to clarify that, yes, Judge Wilson granted the Rule 29 on the forcible accompaniment issue, and I want this Court to sustain his grant of the Rule 29 on the 924C and the gun use issue as to the bank robbery. And I think, as Your Honor was pointing out during Counsel for Carr's argument, I mean, Judge Wilson did make some very explicit factual findings in his written order granting the Rule 29 as to the gun use, and I don't think the government's briefing ever addresses in any way how that, those factual findings could constitute clear error. So, you know, he really was pretty thorough in that respect and very direct in that respect. As for sentencing, the relief I'm seeking is a remand for resentencing because he seemed to just choose this 144-month sentence somewhat out of thin air. He had, everyone agreed the base offense level was 26, and if you look at the sentencing summary, or the sentencing guidelines chart, he had to have moved it up to at least a level 28 or 29 to get to 144 months, and he never said why level 26 is not adequate for this man's participation in the offense and for the criminal history category that he had. He called him an architect, right? Pardon? He called him an architect. He did. He definitely made some comments about it. Why were his comments insufficient? Because they weren't directly tied to the numbers. He said, well, I think this guy kind of kept his hands clean, but he definitely had something to do with the planning, and, jeez, you know, he's had some priors involving guns. What do you mean tied to the numbers? The way I read CARDI, and there's not a lot of case law out there explaining it, but the way I read CARDI is if you give an inside guideline sentence, all of the different elements have been taken adequately and taken into consideration, so really the judge just has to say, I've considered 3553A factors and blah, blah, blah. But once you go out, then I believe the only way that this court can meaningfully review a sentence that's outside is if the judge explains an additional four years is necessary to prevent these. An additional four years is necessary. So my counsel, forgive me for interrupting, but your time is so short. I know, I know. Why were his words insufficient? Why did he not give us an adequate explanation? Because he didn't say, I am giving an extra two years, whatever it worked out, more than two years, like two and a half years, 29 months, right, at least 29 months above the high end of what the guidelines were based on the fact that it doesn't, that the guidelines do not adequately represent his culpability or his criminal history. Almost, I think I'm looking for some of the language. When he says this person's an architect, doesn't that tell me he thinks he's quite culpable? Isn't that what he's getting at? I don't think it covers anything that goes beyond what's already considered in the guidelines. Okay. That's the issue I have, that it doesn't tie it to why it's not, the guidelines didn't do the trick. On the eyewitness identification issue. The architect, what he's saying is that he's the guy that put this together. He's the guy that planned it and all that. Yes. That's what he's talking about. That's correct. It's interesting because his written Rule 29 ruling sort of belies that, because the government's argument all along was if Franklin was the one who planned everything, then obviously he's the one who told everybody to bring guns, and he's the one who directed all the behavior during the offense. And Judge Wilson found that's not true. He may have given information, but he didn't necessarily direct what was going on. And I believe the factual findings explicitly say there's a difference between giving information that's necessary to plan the robbery and being the one who directs how the robbery goes down. And that's in the April 27th written chamber's order granting the Rule 29 on the gun use. And so I think his comments at sentencing about being an architect are not necessarily in line with the comments he made when he granted the Rule 29 on the gun use. And actually, I think the briefing's pretty comprehensive on the eyewitness idea, and I'd rather, unless the court has questions on that, I'd rather save the rest of my time for rebuttal. Thank you. All right. Thank you. Good morning. Mark Yanis for Mr. Anderson. My colleagues have handled things pretty well, and I think the briefing is pretty comprehensive. I did want to just point out that some of the circuits on the Alene issue on the substantial rights and the integrity of the public reputation of the jury system have found that one case out of the four circuits as in light of Alene, we conclude that a sixth-amendment violation involving a mandatory minimum sentence would equally diminish the integrity and public reputation of the judicial system. I don't know if this is quoted in the briefs, and I'm sorry if I hadn't brought that up before, but it's U.S. v. Mubdi, M-U-B-D-I. But I still don't understand. I mean, that goes to the question of whether to grant plain error of view if it was demonstrated to be an impact on substantial rights, but that still leaves open the question of how do you do harm to Sarah under these circumstances? Well, some of these cases, some of these courts have not even done the review. They've held it in light of Alene, and Alene itself, you know, they remanded. What in light of Alene? I don't know what you're saying. Well, the Mubdi case that I was just citing, it's 2013 Westlaw. Yes, what does it say? It says in light of Alene, we conclude that a sixth-amendment violation involving a mandatory minimum sentence would equally diminish the integrity and public reputation. I understand. What does it say about the harm to Sarah question? There's another. We have a whole lot of law in this circuit about harm to Sarah under Apprendi, unless you tell me why Apprendi is different. This speech is in Apprendi is different. I'm assuming all that law applies. And it does allow a fairly extensive harm to Sarah inquiry. Yes. It's difficult to get around it, although I do want to bring up the fact that these other circuits are doing this and saying it might have been. That's fine. But we have our case law, and we have to deal with it. One other court, just to give you perspective on what the Eighth Circuit stated, that Mr. Laura Ruiz, his rights were substantially affected because he was sentenced for a statutory crime different than that which the jury found him guilty. Again, this doesn't get around the Ninth Circuit law in Apprendi, but these courts seem to be taking the view that Elaine is taking a different approach. And for what it's worth, the Elaine court didn't do that on remand either. They just went back and resentenced without a harm analysis. And as far as the other issues, if there's any questions, unless there's any questions, I'll be glad to stand on the briefing. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Rasha Gerges on behalf of the United States. And I would ask to reserve five minutes for rebuttal on the government's cross-appeal, if that's possible. Just to clarify at the outset, there was a factual question that the Court asked regarding the identifications of the robbers. And I think the Court accurately described it, but it might have been a little confused by the answer. There was a dispute at trial between the cooperating witness, the getaway driver, Ms. Fields, and against the eyewitness identifications by the two teller victims. The witness, Fields, had testified that, and from her pretrial identification, has always indicated that Defendant Anderson was the FedEx robber. In her memory, in her mind, Defendant Anderson was the one wearing the FedEx uniform. And the tellers had a different view. Both tellers were in alignment with each other, but against Ms. Fields. That's because they each only saw one. But Wilson, who interacted quite closely with the FedEx robber, said that it was Carr. That's correct. Okay. And then Cervantes never saw the FedEx guy. Cervantes never saw the FedEx guy, but she positively identified Defendant Anderson as the second robber. Right. So that gets back to the first question I was trying to ask opposing counsel about this. The judge made an implicit, and I think Judge Berzon made this point too, he made an implicit decision about which witness he believes, and it matters in a big way. It's to me, I think, because the only evidence we have about whoever the FedEx person was is that that person approached with a package. That's correct. And we have eyewitness testimony from Ms. Cervantes that that robber, I'll call robber number two, had a gun and brandished it. That's correct. Pointed it at a couple people, three, in fact. That's correct. Right? The judge wasn't convinced that use of a firearm was foreseeable at all to the members of this conspiracy, hence the ruling regarding Defendant Franklin. So why, what evidence is there, how did we get around treating Anderson and Carr differently? Well, Your Honor, the government believes that the district court improperly decided and took credibility issues and decided his version of the story. And it was the primary version that the government was. It was your theory. It was the theory of the government that Ms. Fields just remembered things wrongly, but she did positively identify the truth. Are we now going through this for purposes of the Elaine inquiry? Is that why we're into it? I think just to first clarify the record. Well, but it's relevant. What is it relevant to other than the Elaine issues? Is it also relevant to the Rule 29 motions? It is relevant to the Rule 29 motions to the extent that, again, this shows that the district court kind of picked and chose what he believed and what he didn't. And I think defendants. Well, but of course the problem is that in the end there was still only one FedEx person. That's correct. So it can't be that the jury thought that there were two FedEx people or that there were, and so if you don't sort it out, then you, I mean, is your proposition that he should have held that the jury could have found either one of them to be the guy with the gun and, therefore, they both can be convicted of foreseeing it because either of them could have been the guy with the gun? But they couldn't both have been the guy with the gun. And there was no special verdict required or special finding by the jury. But does that mean that we should assume that the jury found they both had a gun? Well, again, what was argued by the government is that it really didn't matter which individual had the gun. Because you think they're all members of a conspiracy, and you think that all of them, including Franklin, were in the same boat, and it was foreseeable as to all of them. But the trial court judge didn't. And, yes, Your Honor, I know the defense counsel for Mr. Franklin indicated that we should, that there was no evidence that the court's factual findings in the Rule 29 were clearly erroneous. But that's the wrong standard when we're analyzing a Rule 29. Of course it is. But your standard is wrong, too. Well, I can't remember whether it went to that or whether it went to the identification questions. But at one point you quoted what was essentially a Brecht standard, when, of course, it has to be a Chapman standard. So I wasn't understanding that either. Everybody seemed to have their standards mixed up in this case. Well, I apologize, Your Honor. But focusing at least on, I guess, since we're talking about the Rule 29 motions, the district court's findings during the Rule 29 are not entitled to any deference. It's not supposed to make any findings. I understand that. But still, the problem is that he, you can take this sort of at a generality or a specific. If you don't attach basis names to people, it was reasonable on the record for the district judge to think that whoever was the FedEx driver, he said whoever that guy was, it wasn't foreseeable to him. The asportation, not the asportation because he did the asportation, that the gun issue, the use of the gun was not foreseeable to him. And whoever was the other robber, the asportation was not foreseeable to him. Then you have to attach the faces, the names to those people. But the first part has to be right. And they can't double them up. And that was not what the court found. The court did find that the person who he believed to be the FedEx robber, it was foreseeable to him that guns would be used in this robbery. And on appeal, Mr. Carr's attorney never raised the sufficiency of the evidence as to that. But he did find that as to the person who he thought was the other robber, that the asportation was not foreseeable as to him. And so my point is that how does he then decide the Rule 29 motions without deciding which of them is which? Again, the government believed that it didn't matter who did what. That's because you're following with his conclusion. I mean, you're saying that it isn't true that whoever the robber with the gun was, it wasn't foreseeable for him to know about the asportation. But if we thought it was true, if we thought that the district court was right as to that, then what do we do about knowing which is which? Well, I would like to at least address why the government does believe that it was foreseeable as to all of the participants. You can't. I really think it's the weakest part of your argument. Can you repeat that? I think it's the weakest part of your argument. Okay. I mean, because you have to believe that somebody who the plan was that they were going to go into the building and they were going to rob people. Obviously, their plan was not that somebody was going to leave or try to leave and that they then were going to, again, even assuming that this is asportation, that they were going to drag the person back in. That had nothing to do with what they were trying to accomplish. But, Your Honor, this type of robbery was going to be taken by force or intimidation and intimidation. And here we had the delivery uniform only got them halfway. The delivery uniform only allowed the door to be open. There was going to be, it was absolutely foreseeable that a struggle would occur at that door in order to gain entry because a delivery person never enters that door. Counsel, you've briefed this really thoroughly, and I'm worried about your time. Yes, Your Honor. What about the foreseeability of the gun? As to Mr. Franklin or as to all of the? Anybody. The judge found, of course, that it wasn't foreseeable as to Mr. Franklin because there was no evidence that guns were displayed or talked about in planning. And I find that internally inconsistent vis-a-vis Mr. Carr. Your Honor, first of all, I think this case is very similar to the Hoskins case where in the Hoskins case it also involved an inside person similar to Mr. Franklin, someone who had insider information. And with Hoskins there was no indication that at the prior meetings there was no direct evidence at the prior meetings that the person showed or talked about guns. But there was a gun present at the planning meeting in Hoskins. But the Hoskins specifically complained that there was no direct evidence that the guns were discussed or displayed. So his argument was that he never saw a gun during that prior meeting. That's similar to. . . If you have any case law that comes close to what we have here, the gun wasn't discussed, at least there isn't any evidence that it was discussed or in the planning stages or showed or displayed or anything. Well, again, the courts. . . I would direct the court's attention to Carter and Hoskins where they both say that there doesn't need to be actual knowledge of the gun. But I think here there is circumstantial evidence that Defendant Franklin did know that the gun was going to be used and present. Tell me, what did I miss then? What's that circumstantial evidence? First, it's the role and the offense that he particularly played.  He was, as the district court said. . . We assume that because he had worked at the warehouse. Well, then the jury saw photos of this credit union, which is not visible from the street. He was the only person. . . He had a credit union account. He knew the operations of that. . . He knew that a door would not be open unless there was a delivery person in a uniform asking the door to be opened. Even if I agree with all of that, that he knew about the operations of the credit union in this special. . . It's a unique setup in a trailer. How do you get from there to evidence that he knew a gun was going to be used? Well, again, this was going to . . . The nature of the robbery was going to be an overtaking of that credit union. And there are cases that indicate that if there is going to be . . . Like Hoskins, there was going to be an overtaking of a cash room where one female individual was working. So he was going to overtake that. And Hoskins, this court said, that it was foreseeable that with this type of overtaking that guns would be used. But in addition, he was . . . And again, this was not a robbery that was planned immediately just on the spur of the moment. A uniform had to be obtained. They waited . . . At least the jury could infer that they did wait for payday, which was something that Defendant Franklin knew about. He had . . . How much money were they expecting to garner there? Well, according to Ms. Fields, her boyfriend at the time who enlisted her in . . . Her ex-boyfriend enlisted her and said it was going to be a million-dollar lick. They were expecting a big payout. And the testimony that the tellers identified was that there was a Brinks delivery that parked right outside on Tuesdays. Every Tuesday, that's how it was done. And someone who worked at the Vons would know that. And that, on Wednesday, is when the employees would cash their checks at 1030. The robbery occurred at 10 o'clock. Again, all of these facts was something that a reasonable jury could infer that it was something that an inside information was helpful and that Defendant Franklin was the one with that information. Counsel, if you don't win on this point, if you don't, then I'd really like to know what the government's view is about what do we do vis-à-vis there's this implicit finding of fact about Carr's role and Anderson's role. What do we do about that? Well, the jury did find that Carr was, again, there was a distinction as to who was the robber with the FedEx uniform and who was not. It was the government's theory during closing and during the trial that the tellers were correct in their assessment as to who. I know that was your theory, Counsel, but I don't think you're answering my question. Your time is ticking away. Sorry. The jury also heard Fields. Yes. That is not what Fields testified to. That's correct. And you're right. I mean, I know we heard an earlier representation today, but I'm quite sure that Fields' testimony conflicted with the tellers about what role Carr played and what role Anderson played. The jury could have believed Fields. So what do we do about that? If you lose on the other arguments, then what? Well, again, Mr. Carr didn't, he did not appeal the sufficiency of the evidence as to the 924C charge, which was just the use and the possession of the firearm. And so the jury could have found that he either used it or it was foreseeable to him that he used it. And that is not on appeal. And there are cases from this Court and also the Supreme Court case in Dean that says that there doesn't need to be an intentional discharge. It can even be an accidental discharge. So that if you have to know who's doing the discharging. But what is the answer to the point that was made that you're then essentially saying that it's automatically the case that if you can foresee the use of a gun, you can foresee the discharge of it? I believe the Court, this case, this Court in Pineda-Deval said that the defendant need not have intended or foreseen that the gun would go off. So if you are aware that guns are going to be used or be present. That means that this additional enhancement is, is, is air. I mean, or the distinction between the two is air. Again, if, if it is true that you have, you will foresee having, that a co-conspirator will have a gun. But there are two enhancements. One is, one is a lot higher than the other. And it's intended to go after individuals who discharge a gun. And that was the Court's case in Dean. There was, the argument was there has to have been some intentionality. And they said, no, that you should be getting a more harsher sentence if the gun is discharged, whether it's accidental or not. These defendants know each other.  Before, huh? Yes, Your Honor. So they, a couple of probation reports I read that two of them grew up with guns. And had many, had many convictions. What evidence? Gun possession. Yes, Your Honor. Yeah. What evidence did the jury hear that these defendants knew each other before the crime? There was evidence that Defendant Franklin and Defendant Anderson had pre-existing Talked to each other on the phone on that day. That day. That's what they said, isn't it? The phone number of Defendant, of Defendant Anderson was saved in Defendant Franklin's contact as BH, which was a, was a nickname for Defendant Anderson. And also his hat was in, Defendant Anderson's hat, which had his DNA, was found in Defendant's, in Defendant Franklin's car. So there was at least some, and there was calls contemporaneous to the robbery. There's also some indication that, again, the robbery occurred, that there was planning before the robbery occurred because Defendant's car had a FedEx uniform on it. We're talking about whether they knew each other. I'm, we've had your, I'm not really clear what your argument is going to so far. Are we talking about the Allain issue? Are we talking about the Rule 29 issues? What are we talking about? We were talking about the Rule 29 issue. All right. What about the Allain issue? I was asked about how does it affect, if we lose on the Rule 29 issue, then I think that there is no reversible plain error that occurred here. That it's true that there was an error and it was plain because of the change in the law. However, there is no, there is no error that seriously affects any of the defendant's substantial rights. Again, there's no reasonable probability that a jury would have acquitted any of these defendants of the discharge. There was uncontroverted evidence of the discharge. And unlike some cases, the indictment in this case actually charged brandishing and discharge. So the defendants were on notice from the inception of this case that discharge would be, that the heightened levels of sentencing would be applied if they were convicted at trial. So they would have had a motivation to, to challenge the discharge. And that was never done throughout the trial. And there were several witnesses that testified. I'm not understanding why. If they thought it was supposed to be. The jury was aware of the allegations in the indictment. Yes, Your Honor. Yeah. But I don't understand why. Let me ask you this. Why did it take so long for the government to interview the two bank tellers? The robbery occurred on, in February of 08. And they were not interviewed until May of the following year. I believe it was not until there were DNA matches that were obtained from the physical evidence that was, that was found. So before then, we did not know any of the suspects at that time. And so once their DNA was matched to defendant Anderson and defendant Carr from clothing that was found during the flight path of the robbery, then we were able to actually prepare six packs. And how was that? Because their DNA information was already available to the government? That's correct, Your Honor. And how long did that take to make that match? I think it takes a while, Your Honor, unfortunately, because of the way the system is set up. And so it did take quite a while for there to be a DNA match. And then the tellers were interviewed and identified them. And then defendant Fields or, yeah, at that point. Did it take a while because the lab was backed up or what? I think that might be the case. FBI involved. I believe it was an Orange County lab that did those DNA matches. But, again, Your Honor, there was overwhelming and uncontroverted testimony in this case that demonstrated that brandishing and discharge had occurred. And, again, if it was foreseeable to these co-conspirators that a gun would be used, it's also foreseeable that a gun would have to be used. The reason why you carry a gun is if you have to use it, you will use it. And I think that a jury could reasonably infer that and that there is no reason in light of the cases. It's not foreseeable if you're going to go in and pull out a million-dollar cash haul that someone's going to have a gun. Yes, Your Honor. And they knew each other, these people, in the past. Yes, Your Honor. And, again, the specific – these are unique facts where this individual, Defendant Franklin, played a very crucial role in the planning and was also – he led the caravan to the robbery. He was involved on the day of the robbery. That was a thought. He obviously led the caravan because he knew where it was, but that doesn't prove that he organized it. In response to Judge Pergerson's statement, you just said yes, and he said they knew each other in the past. And I didn't hear any – when I asked you that five minutes ago, I didn't hear anything about in the past. I heard about contacts on the day of the robbery. Well, again, Your Honor, I believe the jury could infer that the – that Defendant Anderson and Franklin, at least, and Anderson was the one that, again, we argued had the gun, that they did know each other before the robbery. And that's because the cell phone? Because his – not only were there communications being talked on during the robbery, but his name is programmed into the phone under BH. Okay, so when you say knew each other in the past, we just know a very little window, don't we? We do know a very – we don't know how often they were in communication. But, again, these individuals were all present during a meeting where witness fields showed up late. They had all been there already. The day of the robbery. They had the weapons. The day of the robbery. The day of the robbery. They had the weapons there because there was no pit stop made to go pick up the weapons. It was a 30-minute caravan to the robbery. And so just like in Hoskins, there might not have been direct evidence that a gun was displayed or discussed, just as in Hoskins. But the jury could infer with this type of robbery that the guns would have been foreseeable. Okay. Thank you. I'll reserve the rest of my time for rebuttal. Thank you, Your Honor. Thank you, Your Honors. Briefly, there was a question about a delay in interviewing the witnesses in this case, which, for my purposes, I think goes at least to the eyewitness identification issues. And if you reread the transcript of Officer Agent Tagliaretti's interview, interrogation of Ms. Fields, he has photographs of her car at the Vons that day. That's how they identified her. So as of that day, they had her license plate. Yet she wasn't interviewed for, I believe, like 18 months or a little bit longer. And apparently, I hadn't noticed, actually. Your Honors are very sharp on the records today. The tellers, there was a delay in interviewing them. I didn't really, you know, they didn't identify Mr. Franklin, so they were sort of irrelevant to the ID on him. But the government clearly, on this record, had access to information pretty quickly about at least some leads in the case. And I can't see any explanation in the record at all for the delay of 18 months getting to Fields. No. Because her license plate was displayed on the video cameras. And you don't know when. I didn't miss it. You didn't. Okay. Well, another thing that isn't explained in the record that I wonder isn't connected up to this is what happened to the guy we know was the ringleader and is a ringleader, which is Wilson. What happened to him? I know. I was doing pacer searches and everything trying to figure out where that guy was. She did make, I reread the interrogation transcript last night, and Fields did make some comment that she thought he was picked up at a funeral for gang members shortly after the robbery. You know, apparently the police officers troll those funerals and pick up people that are not supposed to be there. I don't know. But, yeah, the guy who's claiming it's a million-dollar lick, and I have to say, Judge Parderson, there's no evidence on this record that Mr. Fields, Mr. Franklin or Carr or Anderson, for that matter, thought it was a quote-unquote million-dollar lick. And I actually find it somewhat incredible that any brinks is going to bring a million dollars into a little credit union like that. I don't think that's, I mean, there's no evidence on the record one way or the other. That's just what she was told to pull her into the offense. And I, speaking of inferences and what makes sense and what doesn't make sense. About $1,500. I don't even know if it's on the record how much they got. They got about $5,000. Because they had to, I think they tossed it in the park. Yeah. I know. I know. It's always like ridiculously small amounts of money for how much risk they take. But, you know, the government's arguments, and it's reflected in a number of the cases, and I think this court might want to take the opportunity to sort of veer us off this path, seem to assume there's only two kinds of robberies. There's either the note robbery or the takeover robbery. And, you know, each robbery is each robbery. This one is, I've never seen facts like this before, that it's a tiny little trailer and the guy's using a uniform to get in. Is it unforeseeable that Wilson would want to run away? Why was that unforeseeable? She says, I was trying to get out the door. I wanted to run away. Why is that unforeseeable? The reason I believe it's unforeseeable, but this is not part of the record, is I believe that most bank tellers are trained to just sort of give in and give them the money and deal with the consequences later. Apparently not Ms. Wilson did not get the memo. No, she was pretty feisty. Yeah. It was pretty feisty. And pretty effective, by the way. Yes. Pushed him right back out the door. Yes. But what she said, more to the point, I don't mean to be flip, is that she was trying to get away. Right. She didn't want to be in the middle of all that. Right. You know, and the only thing I would say is I believe that in the planning, when you have two larger, younger men, what the age discrepancy is is not necessarily clear on the record, although one of the women was heavy, but in terms of like muscular, right, that it was not likely that anyone was going to try to push them out of the. Ms. Cervantes was like 5'1", but I looked in the record for an indication of how tall the other men were, and Ms. Wilson in particular, because there's this colloquy about having him stand next to her when she pushed him against her head, you know, her chest, how high she would have been, and I could not find their heights. Do you know where I find that in the record? It's usually in the probation reports is their size, so that's where I would look is in the, yeah, it was not. I think it is somewhere. Yeah. What about you seem to have abandoned, as have your colleagues, the argument that the aspiratation enhancement wasn't applicable anyway? That the aspiratation wasn't aspiratation. I didn't really abandon it, but it's not our strongest argument. I think there's problems with that. I think the foreseeability is a much stronger argument. You know, I'll, I still. Our case law seems very tough for you. Yes. On the other hand, again, there's increments, and this is pushing the increment to essentially zero. I mean, in terms of, apparently he pointed her about a foot. Maybe a little more than a foot. I think the distinction that's most problematic here is it looks like she probably got outside of the trailer and was pushed back in and was injured in the process, and I think that arguing that that does not constitute aspiratation. Did they pick her up? It is very close to the line. Did they pick her up? I don't believe so. I think it was just a pushing match. There's no evidence he picked her up, but I think the evidence was that she may have been weighing close to 300 pounds at the time. But the notion that he was forcing her to accompany him. Right. On that theory, it would have been different if he had said he had pushed her back in, but he hadn't gone back in himself. It makes no sense. The whole theory makes no sense. It doesn't make a lot of sense, and if you look at the purpose of the statute, it's really to say there's certain types of robberies that involve kidnappings or something close to a kidnapping, and those are more aggravated and those should be punished more harshly. But then you look at this court's interpretation of what that means, and it moves closer and closer to if there's a shoving match, then the ‑‑ But if he had shoved her in and closed the door, then it couldn't have been aspiratation. Yes. If he had shoved her in and closed the door and kept himself on the outside, then that probably wouldn't be aspiratation. But I think the stronger argument for Mr. Franklin is that it just wasn't foreseeable. I didn't know that she weighed 300 pounds. I believe so. It was something like between 280 and 300.    The court has had a lot of time to think about it. I think it's a good part. Yes. Judge Kristen is nodding her head. I thought they mentioned it an inappropriate number of times. She also said she lost a lot of weight by the time the trial. That's true. I remember that part as well. If the Court has no further questions, I'll defer to ‑‑ Mr. Tremont, did you want to ‑‑ or Mr. Yannis? All right. Thank you. The matter is submitted, and the Court will recess. Judge, she thinks she has it. Oh, I'm sorry. You're so quiet over there. No problem, Your Honor. Just very briefly, with regards to the forced accompaniment and the aspiratation, I think this Court's case in Strobin indicates that the plain language of the statute doesn't require that it has to traverse a few yards or a number of seconds. Accompany usually ‑‑ well, whatever we've said about it. I guess we've said about it. I don't ‑‑ to me, accompany doesn't mean you go, I have a foot, or you go. And the fact that it was outside versus inside really has nothing to do with the statute, right? You'd be making the same argument if they'd gone two feet inside. It's not part of the statute, but some of the courts have indicated that crossing that threshold is something that makes it more of a nontrivial movement. And that was, in a couple of the cases, Davis and Reed from the Seventh and Fifth Circuit, that that was a significant change. But I'm right, or am I right, that if he had just pushed her in and closed the door, that wouldn't meet the statute? If he pushed her in and closed the door, it probably wouldn't meet the statute, but it also wouldn't have happened because then he would never have been able to complete the robbery. In fact, he didn't complete the robbery. It was the other guy who did. Well, if he had closed the door, nobody would have completed the robbery because both of the robbers would have been outside. This is something that had to happen, and it goes to the foreseeability. And I think the court's questioning was correct, that there is a natural instinct. If a delivery person comes to your doorway in your room, in your house, and you open the door and they start pushing you in, the first instinct is to either push, and if you're going to fight it out, or flee, just to get away from the situation. It wasn't just pushing. She was screaming. She was pushing and screaming. And he's pushing her back in, and the statute covers committing or attempting to commit. I don't know why that's different than Strobin, because in Strobin, he didn't want somebody out in the parking lot who was going to be calling the police or keeping him from robbing the bank. Absolutely, Your Honor. And the testimony of Barbara Wilson was that he actually did try to pick her up, but because she was a little larger, he was unable to do so and then pushed her inside. And she testified as to why that was a significant movement for her, because she stopped yelling for help when she was inside. She felt helpless. And in addition, this issue was given to the jury, and there was a specific instruction on this modeled after the 11th Circuit model instructions about is this a trivial movement or is it not a trivial movement. And the jury found that this was a non-trivial issue, a movement, which I think the Fourth Circuit has indicated this is something that should probably go to the jury for them to decide. This is a sort of off-the-side issue having to do with the Allain argument. You didn't, in arguing harmless error with regard to Allain, discuss the judge's alternative sentences. Mr. Carr made an interesting argument, which you did not respond to in your brief, which was essentially that the, once you back out the, if you backed out the Allain, the discharge piece, that the mandatory sentence would have been 180 months and no more. And you never responded to that argument. I thought it was sort of an interesting argument. I mean, they argue that the statute is essentially mandatory and that he has to give 100 that month and no more. I don't believe that that would have been the case. I think that it would have been 100, that he still had a higher range that he could have sentenced to him to, and he specifically found that even if there was no mandatory minimum sentence that applied, that he would have sentenced defendant Carr to 240 months. I don't believe that he was maxed out with all of the different statutes of conviction and having them run concurrent versus consecutive. I think he could have fashioned a remedy to get to 240 months, regardless of whether or not the discharge element was found. And he specifically stated as to defendant Carr that he would have sentenced him to 240 months because of the previous records that he had of using firearms, and that he really did think that if he was let out again, that he would again use a firearm connection to a crime. So I think there was no prejudice to defendant Carr with this ruling, whether or not the jury made the discharge. What was the mandatory maximum? I'd have to apologize. 25 years, isn't it? I believe so, Your Honor. I'm sorry. I have the PSR sitting right there. And, again, they were convicted of a number of different convictions, and the court could have run all of them consecutively and thereby getting the 240 sentence without having any mandatory minimum at all. And, again, I don't want to belabor the point as to the sufficiency of the evidence as to Franklin. Again, the judge even found at sentencing not only that he was the architect, but the genesis of the robbery likely came from him. That is really, you know, a bunch of inferences from the fact, yes, he had knowledge of this place. I mean, I'm sure you have read, you know, transcripts in other cases where there is somebody who knows something and tells his friends, you know, I used to work at this place, and if we go, you know, and these people do this and that. They say, oh, good, let's go rob this place. And you know where it was, you show us. But that doesn't mean he's the architect of it. It means he knows something and he's involved in it. Well, the court just indicated that there are a bunch of inferences, and I think that they could be reasonable inferences. I know, but it seems to me it's a – he has no – there is no direct evidence as to whose idea this was or anything about the planning. Well, Your Honor, I believe that no one would have known about the credit union without – I understand that he – obviously his knowledge had to matter, but that doesn't make – why does it make him an architect, as opposed to him conveying this knowledge to somebody, to a group of people? The architect comes into when he provides information relating to the credit union that others would not know. Others would not know that there is one door to the credit union and it always remains locked. No other robber would know that the only way they can get a teller to open the door is to have a uniform and to come up with a disguise. And so that's why Franklin's role was so integral. He had to talk to them about how this robbery was going to be executed. And, again, just opening the door is not enough. Then they have to talk about, well, how are they going to actually get – both of them get in, not only the delivery person but also another robber. How are they going to go in? All of this would have had to have been discussed with Franklin, and there's no reason why they would keep a secret that they would be using firearms. And I think the fact – especially here, these are unique facts, and there was more than one robber that carried a firearm. I think that is a very crucial fact for us, because I think having two robbers shows some kind of concerted action. And there would be no reason why two robbers would hide the fact from Defendant Franklin, who was the person who had all of the inside information. If there was a metal detector right at the entrance of the credit union, that might have been something that they would want to know, and they would have said, hey, I'm going to bring my gun. Is there a metal detector? All of this the jury was able to think about and consider and make reasonable inferences that the person who knows all of the information – There was no cameras at the time of the robbery. It was a very small facility really geared at only serving Vaughn's employees, and that's why only Vaughn's employees were even made aware of the existence. And there are photographs of this credit union, and from one angle you can't even see that it's a bank or a credit union from the street. All of these facts the jury considered and determined, it was reasonable for this guy who – There was never an argument that he entered the bank or carried the gun, but they concluded that his role in the offense was such that it was foreseeable to him that guns would be used. And I would say just as foreseeable that there was going to be a struggle at the door and that every person's natural human instinct is to either fight or flee, and that is exactly what happened. And that is why it was reasonable, foreseeable, as to both Defendants Franklin and Anderson about the aspiratation, and for Defendant Franklin, his unique role in this offense, and the fact that two robbers had the guns. He was involved in earlier meetings, and he also had a prior or a preexisting relationship, some type of relationship with Defendant Anderson, who he had by his moniker. Again, knowing a person's moniker also shows that there's some kind of relationship. It's not robber number one. They knew their names. They knew their monikers, and that was fine. Planning meetings. I know of one. There is one that we have direct evidence of, but I think a jury could infer that there had to have been other planning discussions, at least, because the discussion of someone needs to go get a FedEx uniform, right? There had to have been some talk. On the other hand, there was something very wrong with their planning because they didn't have anybody to drive the car. Well, they did have multiple people to drive the car. They left their money in the park. I mean, I'm not sure these guys are expert planners, but there's a place at which we're just speculating. But I think that the jury could, there were different facts that the jury could make reasonable inferences from, and I think that's all that the government is asking, is for the court to uphold the reasonable inferences made by the jury, and while the district court, while, you know, while you may disagree as well with the reasonable inferences, it's not necessarily for the courts to decide what those inferences should be or whether, if you were the 13th juror, how you would have handled it. This is something. Thank you, Your Honor. You can save that argument for the next. Thank you, Your Honor. Okay. Thank you. All right. We'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Berzon, Christen